## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| NELSON R. GASKINS, derivatively on behalf of WATSCO, INC. and individually on behalf of himself and all other similarly situated shareholders of WATSCO, INC., | ) ) ) ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| vs. | ) | |
| | ) | |
| ALBERT H. NAHMAD, DAVID C. DARNELL, DENISE DICKINS, STEVEN R. FEDRIZZI, BARRY S. LOGAN, PAUL F. MANLEY, BOB L. MOSS, AARON J. NAHMAD and GEORGE P. SAPE, | ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| WATSCO, INC., a Florida Corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT

Plaintiff Nelson R. Gaskins ("Plaintiff") alleges, upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys, except as to those allegations that pertain to Plaintiff himself, which are alleged upon knowledge, as follows:

1.      Plaintiff brings this action for breach of fiduciary duty derivatively on behalf of Watsco, Inc. ("Watsco" or the "Company"), and as a class action on behalf of the public minority shareholders of Watsco against the Company's controlling shareholder and Watsco's Board of Directors (the "Board").

2.      Watsco's controlling shareholder is Albert H. Nahmad ("Nahmad"), who owns more than 50% of the Company's voting power. Nahmad has served as Watsco's President, Chairman of the Board and Chief Executive Officer ("CEO") for over 40 years. As CEO, Nahmad received compensation valued at over $62.1 million during the Company's 2010-14 fiscal years. A substantial portion of the compensation came in the form of 708,990 shares of Watsco's Class B common stock that the Board's Compensation Committee ("Compensation Committee") issued to Nahmad between January 2011 and March 2015. The Class B common stock was worth $56.2 million and comes with enhanced voting rights of ten (10) votes per share, which equates to 8.85% of the Company's voting power as of March 30, 2015.

3.      As described below, Nahmad's $62.1 million compensation package vastly exceeds what other CEOs received in exchange for performing similar services elsewhere. The excess compensation was awarded to Nahmad through a deficient process and is fundamentally unfair to Watsco and its minority shareholders.

2

4.      Additionally, the Company's minority shareholders have been directly and distinctly harmed as a result of the excessive compensation awarded to Nahmad insofar as the overpayment resulted in an improper transfer of economic value and voting power from the Company's minority shareholders to the Company's controller, thus increasing the economic value and voting power of the Company's controlling shareholder at the expense of the Company's minority public shareholders.

5.      Accordingly, Plaintiff seeks to recover on behalf of the Company and its minority shareholders the value of the overpayment and damages resulting from the improper transfer of voting power from the Company's minority shareholders to Nahmad.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff is a citizen of South Carolina and no defendant is a citizen of South Carolina. This Court has supplemental jurisdiction over Plaintiff's class claim because that claim is sufficiently related to Plaintiff's derivative claims, over which this Court has original jurisdiction, such that it forms part of the same case or controversy under

Article III of the United States Constitution in accordance with 28 U.S.C. § 1367(a).

7.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this district under 28 U.S.C. § 1391 because Watsco is incorporated and headquartered in this district.

## THE PARTIES

9.      Plaintiff is, and has been continuously, a shareholder of Watsco since 2000. Plaintiff is a citizen of South Carolina.

10.     Nominal Defendant Watsco is a Florida corporation with its principal place of business at 2665 South Bayshore Drive, Suite 901, in Miami, Florida. Watsco is the largest distributor of air conditioning, heating and refrigeration equipment and related parts and supplies in the HVAC/R ("HVAC/R") distribution industry. Watsco operates from more than 570 locations in the United States, Canada, Mexico and Puerto Rico, with additional market coverage to Latin America and the Caribbean on an export basis.

11.     Defendant Nahmad has served as the Company's President, Chairman of the Board and CEO since December 1972. Nahmad is also the Chair of the Board's Nominating & Strategy Committee (the "Nominating Committee") and the

Company's controlling shareholder, owning more than 50% of Watsco's voting power. Nahmad is a citizen of Florida.

12.     Defendant Aaron J. Nahmad ("A.J. Nahmad") is Defendant Nahmad's son. He has served as a director since 2011 and also serves as a member of the Board's Nominating Committee. A.J. Nahmad is a citizen of Florida.

13.     Defendant David C. Darnell ("Darnell") has served as a director since 2012. Darnell is a citizen of North Carolina.

14.     Defendant Denise Dickins ("Dickins") has served as a director since 2007, and is the co-chairperson of the Board's Audit Committee. Dickins is a citizen of North Carolina.

15.     Defendant Steven R. Fedrizzi ("Fedrizzi") has served as a director since 2010. Fedrizzi is a citizen of New York.

16.     Defendant Barry S. Logan ("Logan") has served as a director since 2011. Logan is a citizen of Florida.

17.     Defendant Paul F. Manley ("Manley") has served as a director since 1984. Manley is the co-chairperson of the Board's Audit Committee, and has served as Chairman of the Board's Compensation Committee ("Compensation Committee") since at least 1995. Manley is a citizen of Florida.

18.     Defendant Bob L. Moss ("Moss") served as a director from 1992 until November 2012, and was re-appointed to the Board in 2014. Moss serves on the

Board's Compensation Committee, Audit Committee and Nominating Committee. Moss is a citizen of Florida.

19.    Defendant George P. Sape ("Sape") served as a director from November 2003 until March 2014. Sape was also a member of the Compensation Committee from November 2012 until his resignation. On November 9, 2015, the Board appointed Sape to fill a director vacancy arising from Cesar L. Alvarez's decision to withdraw as a nominee for re-election.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Background

20.    Watsco's common stock is divided into two classes, common stock and Class B common stock. Both classes of stock trade on the New York Stock Exchange. Holders of common stock are entitled to one vote per share on each matter that is submitted to shareholders for approval and are entitled to vote as a separate class for the election of 25% of Watsco's directors (rounded up to the next whole number), which presently equates to three directors. Holders of Class B common stock are entitled to ten votes per share on each matter that is submitted to shareholders for approval and are entitled to vote as a separate class for the election of 75% of Watsco's directors (rounded down to the next whole number), which presently equates to six directors. Holders of Class B common stock may convert their shares into common stock on a one-for-one basis.

21.    As of March 30, 2015, the Company had outstanding 30,214,077 shares of common stock, and 4,987,360 shares of Class B common stock.

***Nahmad's Control of Watsco***

22.    At all relevant times, Nahmad — directly and through various other entities or trusts controlled by him — has owned no less than 85% of the Company's Class B common stock, as detailed in the following chart:

| Record Date | Number of Shares | % of Class B Shares |
|:---:|:---:|:---:|
| April 09, 2010 | 3,829,975 | 88.4% |
| April 08, 2011 | 4,099,685 | 88.0% |
| April 05, 2012 | 4,086,208 | 86.8% |
| April 05, 2013 | 4,017,809 | 86.2% |
| April 04, 2014 | 4,171,374 | 85.7% |
| March 30, 2015 | 4,286,853 | 86.0% |

23.    Nahmad's large stake in the Class B common stock has provided him with a majority of the combined voting power of Watsco's outstanding common and Class B common stock. Specifically, as of April 9, 2010, April 8, 2011, April 5, 2012, April 5, 2013, April 4, 2014 and March 30, 2015, respectively, Nahmad had 53.6%, 54.8%, 54.1%, 52.5%, 52.9% and 53.5% of the voting power. Accordingly, as acknowledged in the Company's Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on February 24, 2015, Nahmad has the "voting power to . . . control most corporate actions requiring shareholder

approval." A virtually identical statement appears in Watsco's 10-Ks each year relevant to this action.

24.     With majority ownership of the Class B common stock, Nahmad has the voting power to elect six members of the Company's nine-person Board.

25.     Nahmad is also the Chair of the Nominating Committee, which is responsible for the selection and retention of Board members, the evaluation of directors and director nominees and the remuneration of directors. Nahmad's son, Defendant A.J. Nahmad, also serves on the Nominating Committee, along with Defendant Moss. Each member of the Nominating Committee was elected by holders of Class B common stock, *i.e.*, they were hand-selected by Nahmad himself.

26.     A.J. Nahmad also owns Class B shares, as do Defendant Barry Logan, another director and employee of the Company, and Ana M. Menendez, an officer of the Company. These three individuals control approximately 5.6% of the Class B shares and they all work for Nahmad.

### Nahmad's Excessive Compensation Package

27.     The Board has delegated the responsibility for determining Nahmad's compensation to the Compensation Committee.

28.     Nahmad's annual compensation package comprises a base salary, certain perquisites and the opportunity to earn stock awards upon the achievement

of performance metrics. Nahmad's 2011-2014 compensation is disclosed in Watsco's 2011-2015 Schedule 14A Proxy Statements filed with the SEC (collectively, the "Proxies").[1]

29.     As Watsco's CEO, Nahmad received compensation valued at over $62.1 million during the Company's 2010-14 fiscal years.

30.     Most of the compensation was in the form of stock awards. In total, between January 2011 and March 2015, Nahmad was issued 708,990 restricted shares of Watsco's Class B common stock as follows:

| Fiscal Year | Number of Shares |
|:---:|:---:|
| 2010 | 301,052 |
| 2011 | 58,301 |
| 2012 | 80,543 |
| 2013 | 166,615 |
| 2014 | 102,479 |
| **Total** | **708,990** |

As detailed in the Proxies, these stock awards were worth approximately $56.2 million.

31.     Nahmad's $62.1 million compensation package vastly exceeds what a typical CEO was awarded in exchange for performing similar services elsewhere.

32.     From 2011 through 2014, Institutional Shareholder Service, Inc. ("ISS"), a leading provider of proxy research to institutional investors, identified

---

[1] These proxy statements were filed on April 29, 2011 (the "2011 Proxy"), April 30, 2012 (the "2012 Proxy"), April 22, 2013 (the "2013 Proxy"), April 17, 2014 (the "2014 Proxy") and April 16, 2015 (the "2015 Proxy").

24 publicly-traded companies[2] based on "industry and size criteria" that made up Watsco's peer group for either all or a portion of the 2010-2014 period. The largest of these companies, Masco Corporation, had 32,000 employees in 2014. The smallest company, BlueLinx Holdings Inc., employed 1,700 individuals that year. The mean number of employees for the peer group companies in 2014 was 9,708, and the median companies were WESCO International, Inc. (with 9,400 employees) and Curtiss-Wright Corporation (with 9,000 employees). Watsco employed 5,000 people in 2014, which ranked 20th out of 25. Watsco's market capitalization of $4.47 billion[3] placed it 8th among the 24 peers compiled by ISS, larger than companies such as Applied Industrial Technologies, Inc. ($1.59 billion) but substantially smaller than companies such as Snap-On Incorporated ($9.31 billion). Accordingly, one would expect that Nahmad's compensation would be near the 50th percentile of the ISS peer group.

33.     However, Nahmad's $62.1 million compensation package was not at the 50th percentile of Watsco's peer group. Nor was it near the high end of the peer group. Instead, Nahmad's compensation was, and is, an extreme outlier.

---

[2] RSC Holdings, Inc. was also identified as a peer company but is excluded from this analysis because it was acquired in early 2012 and its financial and compensation data for the five-year period were not available.

[3] All market capitalization data is based on the closing price of each company's stock on October 19, 2015. The mean market capitalization of the peer group was $3.73 billion.

34.    The chart below shows the total compensation paid to the CEOs of each peer company during the 2010-2014 fiscal years, as taken from the "summary compensation table" in each company's respective proxy statements.

| Company | 2010-14 Total | Market Capitalization (in billions USD) |
|---|---|---|
| *Watsco, Inc.* | *$62,101,799* | *4.47* |
| Snap-On Incorporated | $40,324,844 | 9.31 |
| Masco Corporation | $38,874,505 | 9.09 |
| Carlisle Companies Incorporated | $38,205,399 | 5.97 |
| USG Corporation | $37,831,726 | 3.83 |
| Lennox International Inc. | $37,763,423 | 5.30 |
| AMETEK, Inc. | $34,285,068 | 13.10 |
| Curtiss-Wright Corporation | $32,529,883 | 3.05 |
| Armstrong World Industries, Inc. | $31,822,838 | 2.83 |
| Valmont Industries, Inc. | $28,864,196 | 2.28 |
| AAR Corp. | $27,171,516 | .79 |
| United Rentals | $26,394,889 | 6.83 |
| WESCO International, Inc. | $26,284,409 | 2.04 |
| Applied Industrial Technologies, Inc. | $25,004,702 | 1.59 |
| General Cable Corporation | $24,473,539 | .72 |
| MSC Industrial Direct Co., Inc. | $24,338,212 | 3.69 |
| Kaman Corporation | $20,854,140 | 1.01 |
| Nortek, Inc. | $20,739,136 | 1.02 |
| MasTec, Inc. | $18,912,379 | 1.29 |
| Rush Enterprises, Inc. | $17,724,692 | 1.06 |
| Fastenal Company | $12,430,743 | 11.09 |
| BlueLinx Holdings Inc. | $9,523,046 | .06 |
| Beacon Roofing Supply, Inc. | $8,927,085 | 1.70 |
| Universal Forest Products, Inc. | $6,273,058 | 1.43 |
| Titan Machinery Inc. | $4,191,620 | .26 |
| **AVERAGE (not including *Watsco*) =** | $26,233,874 | |

35.    Nahmad's $62.1 million compensation package was approximately 54% more than the high end of the range (the $40,324,844 received by Snap-On

11

Incorporated's CEO), 136% more than the median (the $26,284,409 received by WESCO International, Inc.'s CEO), 137% more than the mean ($26,233,874) and 1,382% more than the low end of the range (the $4,191,620 received by the CEO of Titan Machinery Inc.).

36.     Nahmad received vastly more compensation than the CEOs of much larger companies. Nahmad's compensation was 81% more than that received by AMETEK, Inc.'s CEO, a company with a market capitalization of over $13 billion. Likewise, Nahmad's compensation was 135% more than that received by the CEO of United Rentals, a company 43% larger than Watsco. And Nahmad received a staggering 400% more compensation that the CEO of Fastenal Company, which is two-and-a-half times the size of Watsco.

37.     Compared to just $2.8 million for the peer CEOs identified by ISS, Nahmad's 2010 compensation was in excess of $20 million, which represents more than 25% of Watsco's net income. In 2013 it was the same story: Nahmad's compensation was in excess of $17 million, compared to just $3.8 million for the peer CEOs identified by ISS, which amounted to more than 13% of Watsco's net income.

38.     Nahmad's outsized compensation has created a significant and destabilizing pay disparity within the Company's ranks. The following chart

depicts Nahmad's compensation for fiscal years 2010-14 relative to other named

executive officers who served during that time:

| Executive | 2010 | 2011 | 2012 | 2013 | 2014 | 2010-14 Total | 2010-14 Mean |
|---|---|---|---|---|---|---|---|
| CEO - Albert H. Nahmad | $20,392,521 | $5,056,453 | $7,192,826 | $17,293,252 | $12,166,747 | $62,101,799 | $12,420,360 |
| CFO - Ana M. Menendez | $1,376,654 | $759,216 | $572,249 | $872,045 | $523,852 | $4,104,016 | $820,803 |
| SVP - Barry S. Logan | $1,528,391 | $908,253 | $609,265 | $866,125 | $608,852 | $4,520,886 | $904,177 |
| VP, Strategy & Innovation - A.J. Nahmad | $198,663 | $990,159 | $341,248 | $1,601,287 | $1,325,031 | $4,456,388 | $891,278 |

39. This high level of internal pay inequity is further indication of the

existence of a serious problem with the Company's compensation practices.

Internal pay inequity of this magnitude hampers efforts at succession planning and

demoralizes the rest of the executive team, both of which are likely to lead to long-

term problems.

40. Further exacerbating the unfairness of Nahmad's outsized

compensation package is the Compensation Committee's decision to pay out a

substantial majority of the compensation (approximately $56.2 million out of the

$62.1 million) in the form of restricted shares of Watsco's *Class B* common stock,

thus significantly increasing Nahmad's voting power at the same time as providing

him large portions of Watsco's annual net income. As described above, from fiscal

year 2010 through fiscal year 2014, Nahmad was awarded 708,990 such shares.

And as described in the Proxies, despite being subject to vesting restrictions the

shares immediately provided Nahmad with voting rights and the right to receive dividends.

41.     Accordingly, the 708,990 Class B shares — each of which included ten votes per share — provided Nahmad with an additional 7,089,900 votes for all matters requiring shareholder approval, which equates to approximately 8.85% of the voting power as of March 30, 2015, the record date for Watsco's 2015 Annual Meeting of Shareholders ("2015 Annual Meeting"). These grants were necessary for Nahmad to maintain control of the Company, as certain sales of stock by Nahmad coupled with equity grants to other Watsco employees would have pushed his ownership of the voting power of outstanding Watsco stock below 50%. Indeed, had Nahmad been granted one-vote common stock, like every other Watsco employee, instead of ten-vote, Class B common stock, he would have had just 49.51% of the Company's voting power as of March 30, 2015. However, because the 708,990 shares he received were Class B common stock, his voting power instead increased to 53.5%. Accordingly, these equity awards have effectively enabled Nahmad to maintain his control of the Company. Thus, Watsco's excessive compensation program provided Nahmad with the additional benefit of enhancing and maintaining his control by significantly increasing his voting power while correspondingly decreasing the voting power of the Company's minority shareholders.

14

42.     Over the years, ISS has repeatedly criticized Watsco over, among other things, its CEO compensation practices. Specifically, on May 13, 2011, ISS issued a report (the "2011 ISS Report") in connection with Watsco's 2011 Annual Meeting of Shareholders (the "2011 Annual Meeting"). The 2011 ISS Report contained an analysis of Nahmad's compensation package and a warning for shareholders that, "given the sizable 2010 payout to the CEO, shareholders should be concerned with the design of the [Company's executive compensation] program." In the same report, ISS noted that Nahmad's lucrative compensation package also created a significant internal pay disparity within the Company pursuant to which Nahmad "received compensation that is 4.51 times the sum of total compensation for four of the five named executive officers." Given these concerns, ISS recommended that shareholders vote to reject Watsco's 2010 executive compensation program at the Company's say-on-pay vote:

> A vote AGAINST this proposal is warranted, given the uncapped nature of the CEO's incentive program, the substantial restricted stock award granted to the CEO in 2010 and the internal pay disparity at the company.

43.     On June 3, 2011, Watsco filed with the SEC a Form 8-K detailing the results of votes cast on proposals made at the 2011 Annual Meeting, stating that the executive compensation program had been "approved" by a majority of votes cast. Discounting the 41,239,799 votes then controlled by Nahmad and A.J. Nahmad, the advisory vote on executive compensation would have failed.

44.    On May 7, 2013, ISS published a report (the "2013 ISS Report") in connection with Watsco's 2013 Annual Meeting of Shareholders ("2013 Annual Meeting"), which among other things further criticized the "pay-for-performance misalignment" at Watsco. Specifically, ISS drew attention to the excessive size of Nahmad's compensation relative to earnings per share and shareholder value, and consequently recommended that shareholders withhold their vote from Defendant Sape, then a member of the Compensation Committee who was standing for reelection at the 2013 Annual Meeting.

45.    On May 6, 2014, ISS published a report (the "2014 ISS Report") in connection with Watsco's 2014 Annual Meeting of Shareholders ("2014 Annual Meeting"). In this report, ISS recommended that Watsco shareholders vote against (i) approval of a new stock plan that the Board had adopted, and (ii) an advisory vote on named executive officers' compensation. ISS recommended against approval of the new plan because it would allow for a transfer of up to 14% of shareholder equity to plan participants as a result of new stock awards and lapsed restrictions on stock awards.

46.    With respect to the 2014 say-on-pay vote[4], ISS recommended a vote against the proposal because: "[g]iven the unlimited payout potential under the

---

[4] On July 21, 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act was signed into law. Section 951 of the Dodd-Frank Act requires that companies include a resolution in their proxy statements asking shareholders to

CEO's annual incentive program and its contribution to pay which has increased disproportionately with shareholder returns relative to peers, concerns are raised regarding the design of the pay program and a pay-for-performance misalignment is evident."

47.   On May 22, 2014, Watsco filed with the SEC a Form 8-K detailing the results of votes cast on proposals made at the 2014 Annual Meeting and again indicating that the proposals had been approved by a majority of votes cast. As discussed in further detail below, discounting the 42,599,725 votes then controlled by Nahmad and A.J. Nahmad, both the proposal to approve the new incentive plan and the 2014 advisory vote on executive compensation would have failed.

**The Compensation Committee's Deficient Process of Determining Nahmad's Compensation**

48.   Given that the process used in determining Nahmad's compensation was fraught with problems, it is no surprise that Watsco grossly overpaid him for his services. As described in further detail below, Nahmad's compensation was approved by a two-member Compensation Committee whose Chair has served on the Board alongside Nahmad for 30 years. Among other things, the Compensation Committee: (a) allowed Nahmad to determine certain aspects of his own compensation; (b) did not compare Nahmad's compensation with a peer group; (c)

---

approve, in an advisory vote, the compensation of executive officers, *i.e.* a "say-on-pay" vote.

did not seek the advice of a compensation consultant; (d) failed to consider the expropriation of minority shareholders arising from grants of ten-vote stock; (e) did not meet with the purportedly independent Class-A Board members in executive session to discuss Nahmad's compensation; and (f) did not condition Nahmad's compensation upon approval of Watsco's minority shareholders.

49.     Adding insult to injury, after a majority of the Company's minority shareholders rejected the Company's executive compensation program in the Company's first say-on-pay vote, the Compensation Committee absurdly counted Nahmad's own votes to justify his compensation.

50.     The advisory approval solicited in the 2011 Proxy, however, would have been deemed definitively rejected were it not for Nahmad and his son. The 2011 say-on-pay vote was approved by only 49.12% of votes cast not counting those cast by Nahmad and A.J. Nahmad. Specifically, only 12,707,553 votes would have been cast in favor of the resolution, while 13,161,395 votes were cast against it. Nahmad and his son dictated the outcome by casting their 41,239,799 votes in a self-interested fashion.

51.     In the 2012 Proxy, the Compensation Committee nevertheless cited this supposed 79% "approval" rate in the say-on-pay vote, and stated (seemingly without irony) that it would take this "support" into account when making future compensation decisions. As stated in the 2012 Proxy:

In 2011, shareholders were presented with a non-binding advisory vote to approve the executive compensation of our NEOs, *which was approved by 79%* of the votes cast on the proposal. *These results demonstrate shareholder support for our overall executive compensation objectives and decisions.* The Committee takes into account the outcome of advisory votes on executive compensation when considering future executive compensation arrangements and potential changes to the executive compensation program. (emphasis added).

52.     Three years after the initial advisory vote, the 2014 say-on-pay resolution was approved by only 38.3% of votes cast not counting those cast by Nahmad and his son. Specifically, 11,998,215 votes were cast in favor of the resolution, while 19,290,772 votes were cast against. Once again, Nahmad and A.J. Nahmad used their 42,599,725 votes to dictate the outcome.

53.     In the 2015 Proxy, the Compensation Committee discussed the results of the 2014 say-on-pay vote in a similarly disingenuous fashion:

In 2014, shareholders were presented with a non-binding advisory proposal to approve the compensation of our NEOs, which *shareholders approved by 74%* of the votes cast on the proposal. The Committee considers the results of the advisory votes on executive compensation together with the Company's compensation philosophy, as described in this Compensation Discussion and Analysis, when considering executive compensation arrangements, including any changes to the executive compensation program. The next non-binding advisory vote to approve the executive compensation of our NEOs will be held at our 2017 annual meeting. (emphasis added.)

54.     The Compensation Committee completely ignored the minority shareholders' rejection of Nahmad's prodigiously generous compensation package, and instead counted Nahmad's own votes to reach the conclusion that shareholders

supported Watsco's executive compensation program. This is akin to a candidate winning the popular vote in a "democratic" election by casting a majority of the votes himself. The Compensation Committee's absurd approach to evaluating the say-on-pay vote is powerful evidence of its lack of independence.

55.     As noted above, the Compensation Committee likewise relied on Nahmad's "approval" of his own compensation when reporting the results of the say-on-pay vote in 2014. The Compensation Committee's process remained a sham; so, too, did the results.

56.     None of this comes as a surprise given the composition of the Committee. Nahmad's compensation was approved by a two-member Compensation Committee, comprised of Manley and Moss through November 2012, Manley and Sape until 2014 and Manley and Moss since Sape's resignation in 2014. Manley, Moss and Sape were each nominated to the Board by Nahmad, who serves as Chairman of the Nominating Committee. Moreover, only the Class B common shareholders had the power to elect Manley, Moss and Sape, and accordingly, Nahmad at all times ensured their positions on the Board.

57.     Manley has served as Chairman of the Compensation Committee for 20 years, and has served on the Board alongside Nahmad for over three decades. The extraordinary longevity of his service on a Board controlled by Nahmad calls his independence into serious doubt even without accounting for the fact that he is

responsible for approving the compensation packages Nahmad receives each year. According to a recent ISS report dated October 2013, in which over 150 institutional investors were polled, approximately 63% of respondents agreed that "a director's ability to serve as an independent steward is diminished when he or she has served too long." With respect to the length of board service that would compromise the independence of a director, the most common response among investor respondents was more than ten years. The same report noted that in most of continental Europe, a director with tenure exceeding twelve years is automatically deemed non-independent.

58.    The Compensation Committee also allowed Nahmad to participate in determining certain aspects of his own compensation. For example, as stated in the Company's Proxies, the Compensation Committee was responsible each year to "determine **with the CEO** his base salary and incentive compensation for that year." (emphasis added). Additionally, Nahmad was given a say as to what performance metrics he would need to achieve in order to earn the restricted stock awards. As stated in the Company's Proxies, "the [Compensation] Committee and Mr. Nahmad **mutually agree**, within the first 90 days of the calendar year, on the metrics to be used in determining performance-based compensation for the applicable year." (emphasis added).

59.    The Compensation Committee did not even compare Nahmad's compensation package with those received by the CEOs of peer companies in order to make a determination as to whether Nahmad's compensation was fair. As stated in the 2011, 2012 and 2013 Proxies, "the Committee does not benchmark base pay (or any other element of executive compensation) at any particular level versus a peer group or compensation survey data." Virtually identical statements are made in the 2014 and 2015 Proxies.

60.    The use of a peer group in determining CEO compensation is a basic aspect of sound corporate governance. Indeed, Listing Rule 303A.05 of the New York Stock Exchange (where Watsco stock is traded) counsels that "in determining the long-term incentive component of CEO compensation, the [compensation] committee should consider . . . the value of similar incentive awards to CEOs at comparable companies. . . ."

61.    Additionally, according to the Company's Proxies, while they did make sure to consult with Nahmad himself, the Compensation Committee did not seek the input or advice of any independent compensation consultant or advisor in determining what a fair level of compensation would be for Nahmad. Compensation committees are routinely advised to use independent compensation consultants when developing an executive compensation program. The

22

Compensation Committee's failure to use one is another strong indication of a failed compensation program.

62.     The Compensation Committee was also not bound by any meaningful limits when granting compensation to Nahmad. First, there were no shareholder-approved limits with respect to Nahmad's base salary, and thus the Compensation Committee had absolute discretion in setting this component. Second, although the Compensation Committee granted Nahmad stock awards pursuant to the terms of a shareholder-approved plan, there were no meaningful limits in that plan restricting the total amount of stock awards that the Compensation Committee could grant Nahmad. To the contrary, both the Amended and Restated 2001 Incentive Compensation Plan and the 2014 Incentive Compensation Plan, pursuant to which the restricted stock awards at issue were granted, provide that an individual participant could receive stock awards covering as many as 3,000,000 shares per year — which, given the Company's closing stock price of $127.25 per share on October 19, 2015, equates to an illusory "cap" of over $381 million per year.

63.     What is more, without the 42,599,725 affirmative votes cast by Nahmad and A.J. Nahmad, the 2014 Incentive Compensation Plan would not even exist, as it would have failed by a vote of 15,623,823 for and 15,771,008 against, with 232,489 abstentions. Clearly, that plan could not be deemed to have a "meaningful" shareholder-approved limit.

23

### *The Company's Minority Shareholders Have Been Directly Harmed*

64.    The Company paid Nahmad $62.1 million in compensation — which included 708,990 restricted shares of Class B common stock — in exchange for services that were worth far less.

65.    At the same time, the overpayment resulted in an improper transfer of economic value and voting power from the Company's minority public shareholders to Nahmad. As a result of the overpayment, the economic value and voting power of the Company's controlling shareholder increased while that of the Company's minority public shareholders decreased.

66.    Accordingly, the harm resulting from the overpayment was not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also resulted: an extraction from the minority shareholders, and a redistribution to Nahmad, of the economic value and voting power embodied in the minority interest. As a consequence, the minority shareholders have been harmed, uniquely and individually, to the same extent that the controlling shareholder has been correspondingly benefited.

67.    Not only did the excessive stock issuances increase Nahmad's voting power, but it also enabled him — whose voting power has hovered slightly above 50% over the past few years — to maintain control of the Company. As of the record date for each of Watsco's 2011-2015 Annual Shareholder Meetings,

Nahmad has owned shares representing 54.8%, 54.1%, 52.5%, 52.9% and 53.5% of the voting power, respectively. Not counting the issuance of the 708,990 Class B shares, Nahmad's voting power would have just been 52.9%, 51.8%, 49.6%, 49.0% and 49.0%, respectively, during these years. Accordingly, these equity awards have effectively enabled Nahmad to maintain control of the Company.

68.    Additionally, the issuance of the 708,990 Class B shares to Nahmad provided him with the ability to unload shares without losing majority control of the Company. For example, in November 2012, Nahmad converted 133,414 shares of Class B common stock into regular common stock, and then sold the common stock for proceeds of over $9.5 million. However, if not for the 439,896 shares of Class B common stock issued to Nahmad as part of his excessive compensation package, these stock sales would have pushed Nahmad's voting power down to 49.56% as of April 5, 2013, the record date of the 2013 Annual Meeting. However, awards of Class B shares had increased Nahmad's voting power to 52.5% by the time of the 2013 Annual Meeting, providing Nahmad with the ability to make these sales and retain his control of the Company. Plaintiff seeks to recover on behalf of the minority public shareholders the value of the overpayment to Nahmad, as well as damages resulting from the improper transfer of substantial voting power to Nahmad.

69.    To make matters worse, by issuing the 708,990 Class B shares to Nahmad, the Board entrenched the directors selected by Class B shareholders. Article III(B)(3)(g) of the Composite Articles of Incorporation of Watsco, Inc. as Amended and Restated through May 25, 2012 ("Articles of Incorporation") provides that:

> If, on the record date for any shareholder meeting at which directors are to be elected, the number of issued and outstanding shares of Class B Common Stock is less than 12 1/2 % of the aggregate number of issued and outstanding shares of Common Stock and Class B Common Stock, then the holders of Common Stock shall continue to elect a number of Class A Directors equal to 25% of the total number of directors constituting the entire board of directors and, in addition, shall vote together with the holders of Class B Common Stock to elect the Class B Directors to be elected at such meeting, with the holders of Common Stock entitled to one (1) vote per share and the holders of Class B Common Stock entitled to ten (10) votes per share.

70.    A nearly identical provision appears in the Amended and Restated By-Laws of Watsco, Inc. ("By-laws"). Article I(5)(i)(7) of the Bylaws provides that:

> If, on the record date for any shareholder meeting at which directors are to be elected, the number of issued and outstanding shares of Class B Common Stock is less than 12-1/2% of the aggregate number of issued and outstanding shares of Common Stock and Class B Common Stock, then the holders of Common Stock would continue to elect a number of Common Stock Directors equal to 25% of the total number of directors constituting the whole board and, in addition, would vote together with the holders of Class B Common Stock to elect the Class B Common Stock Directors to be elected at such meeting, with the holders of Common Stock entitled to one (1) vote per share and the holders of Class B Common Stock entitled to ten (10) votes per share.

71.    According to the 2015 Proxy, as of the record date for the 2015 Annual Meeting there were 35,201,437 outstanding and issued shares of common stock and Class B common stock. Had the Board not granted Nahmad 708,990 shares of Class B common stock over the last five years, there would only have been 34,492,447 total shares of outstanding and issued Watsco stock, of which 4,278,370 would have been Class B common stock shares. In other words, but for the challenged grants, the number of issued and outstanding shares of Class B common stock would have been equal to only 12.404% of the aggregate number of issued and outstanding shares of common stock and Class B common stock[5], entitling common shareholders to vote together with the holders of Class B Common Stock to elect the Class B directors.

72.    By granting Nahmad the equity awards challenged herein, the Board deprived Watsco common shareholders of the right to vote together with Class B common stock shareholders for Class B directors.

73.    This denial of the shareholder franchise to holders of Watsco common stock resulted, and was intended to result, in the entrenchment of the Class B directors, who remain accountable to solely the Class B common shareholders,

---

[5] Had the Board granted Nahmad shares of common stock instead of Class B common stock, then the number of issued and outstanding shares of Class B common stock would have equaled only 12.154% of the aggregate number of issued and outstanding shares of common stock at the record date for the 2015 Annual Meeting.

notwithstanding provisions in the Articles of Incorporation and the By-laws which should have entitled holders of common stock to vote on the election of the Class B directors.

***Plaintiff Makes a Demand and the Board Wrongfully Refuses to Act***

74.     Pursuant to Section 607.07401(2) of the Florida Statutes, on June 30, 2015, Plaintiff sent a written demand letter to the Board describing in detail the wrongdoing set forth herein and demanding that the Board take action to rescind the excessive compensation that the Compensation Committee awarded to Nahmad (the "Demand," annexed hereto as Exhibit A).

75.     At the time Plaintiff made the Demand, the Board comprised Defendants Nahmad, Darnell, Dickins, Fedrizzi, Logan, Manley, Moss and A.J. Nahmad.

76.     Of these directors, each of Dickins, Logan, Manley, Moss and A.J. Nahmad were hand-selected by Nahmad in his capacity as the Company's controlling shareholder. Moreover, Darnell is Vice Chairman, and recently served as co-chief operating officer, of Bank of America, which provides millions of dollars' worth of banking and leasing services to Watsco each year. Darnell's financial relationship with the Company similarly calls his independence into question.

77.     The Board delegated consideration of the Demand to a special committee comprised of two members of the Board, Dickins and Fedrizzi (the "Special Committee").

78.     On September 30, 2015, Dickins advised Plaintiff that the Special Committee had purportedly considered the Demand, and determined to refuse it in its entirety ("Refusal," annexed hereto as Exhibit B).

79.     The Refusal does not indicate that the authority to consider the Demand was delegated to the Special Committee by only the independent directors of the Board, as required by Florida law.

80.     According to the Refusal, the Special Committee found that it was "not in Watsco's best interests to pursue any action founded upon the allegations in the Demand Letter." Specifically, the Special Committee's investigation purportedly "found no disabling conflict by any current or former member of Watsco's Compensation Committee or any improper allegiance by any of them to Mr. Nahmad to suggest a lack of independence," and "no indication that, in setting and approving the amount and form of Mr. Nahmad's compensation, any current or former Compensation Committee member acted other than in good faith."

81.     The Special Committee's naked conclusions patently contradict the information disclosed in the Company's public filings, as well as the content of the various ISS reports, all of which in fact support the exact opposite determination:

Nahmad, through a flawed process, dictated his compensation to the Compensation Committee, who proceeded to follow his mandates and award him excessive compensation, chiefly in a form that extracted voting power and its monetary value from the Company's minority shareholders.

82.    The Refusal is especially light on substance, offering instead an empty litany of self-serving conclusions. The complete absence of any reasoned explanation in the Refusal evidences that the Board refused the Demand through a peremptory and perfunctory process that was every bit as deficient as the process used to determine Nahmad's compensation in the first place.

## CLASS ACTION ALLEGATIONS

83.    Plaintiff brings Count I as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of shareholders of Watsco common stock that owned shares from January 13, 2011 to March 4, 2015 (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest, as well as holders of Watsco Class B common stock.

84.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of March 30, 2015, Watsco represented that

over 30 million shares of common stock were outstanding. All members of the Class may be identified from records maintained by Watsco or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

85.     Questions of law and fact are common to the Class, including, *inter alia*, whether the compensation paid to Nahmad was unfair, whether the compensation improperly transferred voting power from the Company's minority shareholders to Nahmad and whether Defendants breached their fiduciary duties to the Class.

86.     Plaintiff's claims are typical of the claims of the other members of the class. Plaintiff is committed to prosecuting this action, will fairly and adequately protect the interests of the Class and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

87.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

88.     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties

to the adjudications or substantially impair or impede their ability to protect their interests.

89.     Defendants have acted on grounds generally applicable to the class, making appropriate final injunctive relief with respect to the Class as a whole.

## COUNT I
### Breach of Fiduciary Duty
### (Direct Claim against All Defendants)

90.     Plaintiff repeats each allegation contained above as if fully set forth herein.

91.     As directors of the Company, each Defendant owed fiduciary duties to the Company and its shareholders.

92.     Defendants breached their fiduciary duties to the Company's minority public shareholders by granting Nahmad the excessive compensation, largely in the form of the ten-vote Class B shares challenged herein.

93.     The issuance of the challenged Class B common stock to Nahmad resulted in an improper transfer of economic value and voting power from the Company's minority public shareholders to Nahmad, who controls the Company. As a result of Defendants' wrongdoing, the economic value and voting power of the Company's controlling shareholder increased while that of the Company's public minority shareholders correspondingly decreased.

94.     The issuance of the challenged Class B common stock to Nahmad also deprived Watsco common shareholders of the right to vote on the election of the Class B directors, which they otherwise would have realized under both the Articles of Incorporation and the Bylaws. This further resulted in the entrenchment of the Class B directors, who remain beholden to only the Class B common shareholders, instead of holders of common stock and Class B common stock voting together as a class.

95.     Defendants' actions, in stripping away economic value and voting power from the Company's minority public shareholders, were designed to advance Nahmad's interests to the detriment and expense of the Company's minority public shareholders, and constitute a breach of their fiduciary duties.

96.     As a result of the misconduct described above, Defendants have caused loss and damages to Plaintiff and the Company's minority public shareholders for which Plaintiff seeks appropriate judicial relief.

## COUNT II
### Breach of Fiduciary Duty
### (Derivative Claim against All Defendants)

97.     Plaintiff repeats each allegation of paragraphs 1-89 contained above as if fully set forth herein.

98.     Defendants breached their fiduciary duties by causing Watsco to issue Nahmad excessive compensation.

99.     Defendants breached their fiduciary duties by failing to implement proper and adequate processes and controls that would have ensured that the amount and form of Nahmad's compensation was awarded by independent and disinterested persons. To the contrary, Defendants effectively allowed Nahmad to dictate his own compensation, which resulted in the transfer of excessive compensation to Nahmad.

100.    As a result of the Defendants' actions, the Company has been and will be damaged

101.    Plaintiff and the Company have no adequate remedy at law.

## COUNT III
### Unjust Enrichment
### (Derivative Claim against Nahmad)

102.    Plaintiff repeats each allegation of paragraphs 1-89 contained above as if fully set forth herein.

103.    Defendant Nahmad was unjustly enriched by the receipt of excessive compensation, and it would be unconscionable to allow him to retain the benefits thereof.

104.    To remedy the unjust enrichment of Nahmad, the Court should order him to disgorge the excess compensation.

105.    Plaintiff has no adequate remedy at law.

## COUNT IV
### Breach of Fiduciary Duty

34

**(Derivative Claim against Dickins and Fedrizzi)**

106.   Plaintiff repeats each allegation of paragraphs 1-89 contained above as if fully set forth herein.

107.   As directors of the Company, Dickins and Fedrizzi owed the Company and its shareholders the fiduciary obligations of loyalty, good faith and due care.

108.   In rejecting Plaintiff's Demand, Dickins and Fedrizzi violated their fiduciary duties and acted in bad faith by, among other things, failing to pursue legal action on behalf of Watsco, thereby permitting Nahmad to retain his excessive and unfair compensation, which resulted in the extraction of voting power and its monetary value from Watsco's minority shareholders.

109.   Dickins and Fedrizzi's actions were not a good faith exercise of business judgment to protect and promote the interests of the Company and its shareholders, but instead were acts in breach of the Defendants' duty of loyalty that lined the pockets of Nahmad at the expense and to the detriment of the Company.

110.   As a result of Dickins and Fedrizzi's actions, the Company has been damaged.

111.   Plaintiff and the Company have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests trial by jury on all claims so triable and entry of judgment as follows:

A.      Disgorgement of the excessive compensation (both cash and stock payments) granted to Nahmad in exchange for his services during the 2010-2014 fiscal years;

B.      Awarding damages against all Defendants in favor of the Company as a result of Defendants' breaches of fiduciary duties, plus pre-judgment and post-judgment interest;

C.      As to Count I, declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

D.      As to Count I, awarding damages against Defendants in favor of the Class as a result of Defendants' breaches of fiduciary duties, plus pre-judgment and post-judgment interest;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts and accountants; and

F.      Granting Plaintiff such other and further relief as the Court may deem just and proper.


Dated: December 22, 2015                Respectfully submitted,

**KOMLOSSY LAW P.A.**

/s/  Emily C.  Komlossy
Emily C. Komlossy (FBN 7714)
Ross A. Appel (FBN  90865)
2131 Hollywood Blvd., Suite 408
Hollywood, FL  33020
Telephone:  954-842-2021
Fax: 954-416-6223

LEVI & KORSINSKY, LLP
Steven J. Purcell
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Plaintiff*

## VERIFICATION

Under penalty of perjury under the laws of the United States of America and the State of Florida, I declare that I have read the foregoing, and that the facts alleged therein are true and correct to the best of my knowledge and belief.

Nelson R. Gaskins

Dated this _11_ day of December 2015.